# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DAVID E. KATES, | : | NO. 3:CV-13-1525 |
| Plaintiff | : | |
| | : | (Caputo, J.) |
| v. | : | (Saporito, M.J.) |
| | : | |
| ROBERT PACKER, ET AL., | : | |
| Defendants | : | Filed Electronically |

## DEFENDANTS' EXHIBITS IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

BRUCE D. BRANDLER
United States Attorney

s/ Michael Butler
Michael Butler
Assistant United States Attorney
PA 81799
United States Attorney's Office
228 Walnut Street, 2d Floor
P.O. Box 11754
Harrisburg, PA 17108
Tel:  717-221-4482
Fax: 717-221-2246

Dated:  March 1, 2017          Michael.J.Butler@usdoj.gov

## INDEX

Excerpt of Videoconference Deposition of David Kates..........................................Ex. A

Declaration of C. Brandt...............................................................................................Ex. B

Declaration of G. Wise..................................................................................................Ex. C

Declaration of J. Wagner..............................................................................................Ex. D

Declaration of D. Eroh, Jr. ..........................................................................................Ex. E

David Kates 1/9/2017

GOVERNMENT
EXHIBIT
CARDELS 800-783-0399
A

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


DAVID E. KATES,                  :        NO. 3:CV-13-1525

    Plaintiff                    :

                                 :        (Caputo, J.)

v.                               :        (Saporito, M.J.)

                                 :

ROBERT PACKER, ET AL.,           :

    Defendants                   :



VIDEOCONFERENCE DEPOSITION OF DAVID KATES



Taken at the instance of the Defendants at Federal
correctional Complex, Medium, United States
Penitentiary, 2225 Haley Barbour Parkway, Yazoo
City, Mississippi on Monday, January 9, 2017,
beginning at 10:34  a.m.



REPORTED BY: LORI W. BUSICK
             Brooks Court Reporting
             12 Lakeland Circle, Suite A
             Jackson, Mississippi 39216
             (601)362-1995

~~ORIGINAL~~

David Kates 1/9/2017

```
 1    APPEARANCES:

 2
         David E. Kates
 3       Reg. No. 30428-077
         FCI Yazoo City
 4       Post Office Box 5000
         Yazoo City, Mississippi 39194

 5

 6          PRO SE WITNESS

 7

 8    MICHAEL J. BUTLER, ESQ.  (VIA VIDEOCONFERENCE)
         Assistant United States Attorney
 9       316 Federal Building
         240 West Third Street
10       Williamsport, Pennsylvania 17703
         Email: Michael.J.Butler@usdoj.gov

11

12          COUNSEL FOR DEFENDANTS

13

14

15

16

17

18

19

20

21

22

23

24

25
```

David Kates 1/9/2017

```
 1    The video shows me being escorted out the cell all
 2    the way to the end of the range.  The assault
 3    occurred in a blind area outside the video footage.
 4        Q.   Would you agree that that same -- that
 5    same logic could be said that the video didn't show
 6    you biting Packer's finger because it was in a
 7    hidden spot that the video couldn't capture?
 8        A.   No, sir.  That's absolutely untrue.
 9        Q.   Why is that not true?
10        A.   Because Packer's accusations, write-up,
11    declarations and memorandums about the assault
12    states that it occurred right outside the cell in
13    video presence.
14        Q.   Did you see documentation that Officer
15    Packer was injured in his finger?
16        A.   Could you repeat that again, sir?
17        Q.   In your review of the evidence, did you
18    see any medical record that Officer Packer had a
19    injured finger?
20        A.   The only evidence I received or reviewed
21    was a injury assessment report stating that his
22    finger had been bitten.
23        Q.   All right.  Let's back up to how this
24    event initially transpired.  Tell me what happened
25    prior to you being removed from your cell?
```

David Kates 1/9/2017

```
 1        A.    What happened prior from me being removed
 2    from the cell was, earlier that evening around
 3    7:00 p.m. CO Packer and another CO who is not
 4    involved in this lawsuit, I believe Kepner, searched
 5    me and Mr. Collins' cell.  They violated the BOP
 6    policy by destroying the cell, leaving it in
 7    disarray, taking unauthorized property from the
 8    cell.  That's what started the incident.
 9        Q.    So what happened after they allegedly took
10    this property?
11        A.    After they allegedly took the property, I
12    notified the range officer who was Eroh, Jr. at that
13    time and gave him a list of the things that was
14    missing and asked him to notify his superior, which
15    was a lieutenant.
16        Q.    Who was the lieutenant at the time?
17        A.    I believe the first lieutenant who came to
18    the scene was Lieutenant Booth.
19        Q.    So you notified Officer Eroh, Jr. of your
20    missing property and then Lieutenant Booth came
21    immediately?
22        A.    He came maybe 15, 20 minutes later.
23        Q.    Is that the only reason why he came to
24    your cell is because of the complaint you issued?
25        A.    Yes.  I gave Eroh, Jr. a copy or a
```

David Kates 1/9/2017

```
 1    request, the documents -- or the documents and
 2    property that was missing I wrote it down and gave
 3    it to Eroh, Jr. to give to his superior.
 4         Q.    But I think you're missing part of the
 5    story where you put a cardboard piece of paper on
 6    your window.
 7         A.    No, I was going to get to that.  But I was
 8    just letting you know how this all transpired.  But
 9    anyway, if you want me to continue, I'll continue.
10         Q.    Please do so.
11         A.    Okay.  After Lieutenant Booth came and we
12    discussed the issue with the property, he consulted
13    with the COs who shook the cell down.  I guess they
14    denied taking any personal property or any BOP
15    property.  Then another lieutenant came after that
16    incident.  We didn't get no positive results, so I
17    blocked my window so that staff couldn't see in the
18    cell.
19         Q.    Who was the other lieutenant that came?
20         A.    I believe it was Lieutenant Foura,
21    F-O-U-R-A.
22         Q.    Spell that.
23         A.    F-O-U-R-A.
24         Q.    So are you allowed to cover your window
25    per BOP policy?
```

David Kates 1/9/2017

1        A.    No, sir.

2        Q.    What's the proper way to try to get your

3    property back when property is taken from you?

4        A.    Either try to resolve it with competent

5    staff or either file your administrative remedies.

6        Q.    Rather than do this you decided to take

7    matters into your own hands?

8        A.    No, sir.

9        Q.    I believe you said that you testified that

10   you were unhappy with the situation about how the

11   property was resolved so you put, in violation of

12   BOP policy, a piece of cardboard paper in your

13   window rather than follow BOP policy and file an

14   administrative remedy.  Am I wrong on that?

15       A.    To a certain extent you're wrong.  Because

16   like I stated, I tried to resolve the issue with

17   professional, competent staff.

18       Q.    So your next way is to then file an

19   administrative remedy; isn't that correct?

20       A.    That's one of the resolutions, correct.

21       Q.    What's the other resolutions?

22       A.    I could either file a tort claim for the

23   missing property.

24       Q.    But you did neither of those?  You instead

25   took matters into your owns hands and put a piece of

David Kates 1/9/2017

```
 1    paper on your window; isn't that right?
 2         A.    Correct.
 3         Q.    So what happened after you put the piece
 4    of paper in your window?
 5         A.    The officer Eroh, Jr. came back down the
 6    range during his 30-minute range check, asked me and
 7    my cellmate was we all right and to take it down and
 8    we took it down.
 9         Q.    Then what happened?
10         A.    Then later on that evening, around count
11    time or later on that night around count time, which
12    is a 10:00 p.m. count, we blocked the window again.
13         Q.    Why did you do that?
14         A.    In protest of my property being taken.
15         Q.    So rather than file an appropriate
16    administrative remedy, you decided to take matters
17    into your own hands.  And again, after you were told
18    to remove the piece of paper for safety reasons, you
19    again put another piece of paper on your door at
20    10:00 p.m.; is that right?
21         A.    Right.
22         Q.    Why would the BOP not want you to put a
23    piece of paper on the window?
24         A.    To my knowledge, part of their policy is,
25    they have to see in the cells for the well-being and
```

David Kates 1/9/2017

```
 1    safety of the inmates.
 2          Q.    And knowing this, you still put the piece
 3    of cardboard on the window?
 4          A.    Yes.  In protest of my missing property.
 5          Q.    So the individuals that were outside your
 6    cell had no idea whether or not there was any safety
 7    concerns in your cell because you had blocked the
 8    window with a piece of paper; isn't that right?
 9          A.    Right.  They couldn't see it the cell,
10    correct.
11          Q.    So they couldn't tell whether or not
12    either you or your cellmate were in danger; isn't
13    that right?
14          A.    Correct.
15          Q.    So what happened after you put your the
16    piece of paper on your window at 10:00 p.m.?
17          A.    When the officers came through to do their
18    10:00 p.m. count, they couldn't see in the cell.
19    They asked us to take it down.  We refused to take
20    it down.  And the officers opened the slot and
21    sprayed MK10, or something like that, gas.  They
22    sprayed gas.
23          Q.    All right.  So what happened after they
24    sprayed the gas?
25          A.    After several minutes we still didn't take
```

David Kates 1/9/2017

```
 1    it down.   They opened the slot again and sprayed
 2    more gas and then finally we took it down.
 3           Q.    So why after being told to take the piece
 4    of paper down at 10:00 p.m., why didn't you take it
 5    down when you took it down the first time?
 6           A.    You're saying -- repeat that again.
 7           Q.    You told me earlier that you were asked --
 8    the first time you put a piece of paper on your
 9    window that you took it down.   And then you put it
10    back up again at 10:00 p.m., right?
11           A.    Right.
12           Q.    So then at 10:00 p.m. you were asked to
13    take it down again and you refused.   My question is
14    why?
15           A.    In protest of my property.
16           Q.    You already protested that and you removed
17    it.   Then again you're protesting again.   I don't
18    know why you didn't take it down when you took it
19    down the first time.
20           A.    We protested ten o'clock because ten
21    o'clock is usually when they do their count and the
22    officers change shifts.   So we knew if we kept it up
23    at 10:00 the officers would have to do something
24    before they changed shifts.   So that was part of the
25    protest.
```

David Kates 1/9/2017

```
 1          Q.    So you knew that they would have to put
 2    gas into your cell?
 3          A.    Well, we didn't know that or they didn't
 4    have to do it.  That was something that they chose
 5    to do.
 6          Q.    So not knowing who is safe or who's not
 7    safe in your cell, you would agree they had no
 8    recourse but to spray the gas so that they could get
 9    into your cell so they could determine who was safe
10    and who wasn't; isn't that right?
11          A.    No, sir, that is not correct.
12          Q.    How would they be able to look in your
13    cell when the window is blocked?
14          A.    They could have opened the slot.
15          Q.    Wouldn't you agree that that's dangerous
16    for a correctional officer -- you've been in prison
17    for a while.  Wouldn't you agree that when you open
18    a slot that you could, as a correctional officer,
19    subject yourself to an inmate either assaulting you
20    or spraying you with something?  You would agree
21    with that, right?
22          A.    To a certain extent I would, but they have
23    emergency equipment to protect them from that, sir.
24          Q.    So you wanted the correctional officers to
25    gear up in emergency equipment simply because you
```

David Kates 1/9/2017

```
 1    before.

 2           Q.    Where has that happened before?

 3           A.    In other prisons, sir.

 4           Q.    What prisons did that happen before?

 5           A.    It happened in Oakdale SMU.  It's happened

 6    in Pollock, special housing unit.  It's happened in

 7    Three Rivers special housing unit.  Would you like

 8    for me to continue?

 9           Q.    I'd like to know, in Pollock did this

10    happen when you were there recently, six months ago

11    or a year ago?

12           A.    No, in 2009.  I was in Pollock in 2009.

13           Q.    2009, what correctional officer gave you

14    your property back when you placed a piece of

15    cardboard on your window?  Please name that

16    individual.

17           A.    Do not recall, sir.

18           Q.    Do you recall any correctional officer

19    that gave you your property back because you put a

20    piece of cardboard on the window?

21           A.    Do not recall right offhand but I could

22    refer to the incident reports and some notes.  But

23    not right offhand, no, I don't recall.

24           Q.    All right, sir.

25                 So you were sprayed with gas, you and your
```

David Kates 1/9/2017

```
 1    cellmate.  And so, why not at that point when you
 2    were sprayed with the first shot of gas, why not
 3    take the cardboard down knowing that the officers
 4    were using gas at that point?
 5        A.    The first reason is because it was not
 6    bothering us.  After the second disburse of gas it
 7    began to bother us, so me and my cellie agreed to
 8    take it down.
 9        Q.    So we have correctional officers who you
10    know want that piece of paper down for safety
11    reasons.  They put gas in your cell so that you
12    would take it down, but you disregard that.  And so
13    you wait for another blast of gas before you take
14    the note down; is that right?
15        A.    Correct.
16        Q.    So what did you think would happen after
17    they sprayed that first shot of gas?  Did you think
18    they would just give up and go away or did you think
19    it would escalate after you didn't provide the
20    relief they were requesting by taking the paper
21    down?
22        A.    No, we knew once we took it down we would
23    be taken from the cell.
24        Q.    So why didn't you take it down the first
25    time?
```

David Kates 1/9/2017

```
 1        A.    Again, just in protest of my property,
 2   sir.  Nothing more, nothing less.
 3        Q.    But you knew at some point you were going
 4   to have to take that piece of paper down?
 5        A.    Yes, I knew at some point I would be taken
 6   from the cell.
 7        Q.    So you understood that by your
 8   disregarding that first level of response, by that
 9   first level, that gas response, that the officers
10   would have to escalate their response further; would
11   you agree?
12        A.    No, I don't agree with that.
13        Q.    So what did you expect them to do after
14   that first spray of gas?
15        A.    I just knew, sir, that I would be taken
16   from the cell.
17        Q.    And why did you know that?
18        A.    Because once gas is disbursed you're
19   usually taken from the cell to be decontaminated.
20        Q.    So why not take that piece of paper down
21   so that you could be decontaminated right away?
22        A.    Well, my point was, one or two disburse of
23   the gas didn't really make a difference.  My point
24   was to just get out the cell to protest my property
25   at that point.
```

David Kates 1/9/2017

```
 1        Q.    In your experience, after one or two
 2   bursts of gas are released and there's no effect on
 3   the inmate, what happens next in your experience?
 4        A.    What do you mean?  Could you go into more
 5   detail with that question?
 6        Q.    Sure.
 7              You said that you were -- one or two shots
 8   of gas were disbursed and it didn't affect you.  In
 9   your experience, when gas is released into a cell,
10   one or two bursts, and it doesn't affect you or
11   someone around you, what happens next?
12        A.    Oh, they usually spray more.
13        Q.    So you understood that you were going to
14   be sprayed more once that didn't affect you the
15   first time?
16        A.    Yes, I knew it was a possibility.  Yes.
17        Q.    But yet you still stayed in the cell and
18   you still didn't take the piece of cardboard down?
19        A.    No.  Incorrect.  After the second burst we
20   took it down.
21        Q.    But after the first burst you didn't?
22        A.    Correct.
23        Q.    So what happened when you took the piece
24   of paper down?
25        A.    We took the paper down and they ordered me
```

David Kates 1/9/2017

```
 1        Q.   All right, sir.

 2             So you put -- you went to the slot.  Is

 3   that also called a wicket?

 4        A.   Yes.  Food slot, wicket, yes.

 5        Q.   So you went to the slot.  Who went first

 6   you or Mr. Collins?

 7        A.   I went first.

 8        Q.   So what happened then?

 9        A.   I went to the slot to submit to hand

10   restraints.  Officer Packer was the officer who was

11   applying the restraints.  I stuck my hand out to --

12   so the restraints could be applied.  He smashed my

13   hands in the food slot.  I yelled in pain, remove my

14   hands out the slot.  He asked me to stick them back.

15   I stuck them back again, he applied the restraints.

16   He slammed my hand in the slot again.  Released the

17   slot off my hands, I moved forward.  My cellie Mr.

18   Collins went next.

19        Q.   When you were -- the first time you put

20   your hands in the slot, who was outside your door?

21        A.   I could not see.  I was bent over

22   backwards facing the wall.  It was numerous officers

23   outside the slot.

24        Q.   So how do you know it was Packer that

25   slammed your hands into the slot?
```

David Kates 1/9/2017

```
 1        A.    Because when I first approached the door
 2   Packer was the one that opened the slot and he was
 3   the one who stated for me to submit to restraints.
 4        Q.    But isn't it possible for somebody else,
 5   an unknown officer to come and slam your hand into
 6   the slot?
 7        A.    That's a possibility, yes.
 8        Q.    Because you didn't actually see Packer
 9   slam the slot, did you?
10        A.    No, I didn't see it, but the video did.
11   Correct, I didn't see it.
12        Q.    Did you see the video of Mr. Packer,
13   Correctional Officer Packer slamming your hand while
14   you were in the food slot?
15        A.    I seen the video, but I didn't see that
16   particular incident.
17        Q.    So which part of your hand the first time
18   was slammed when the food slot was shut?
19        A.    Both wrists and hands.  Both wrists.
20        Q.    Did that cause you to bleed?
21        A.    No, sir.  It did not break the skin.
22        Q.    Did it injure you or just startle you the
23   first time?
24        A.    It did both.
25        Q.    How were you injured the first time?
```

```
 1         A.    I was injured from the steel slot being

 2    slammed on my wrists or braised.

 3         Q.    You weren't bleeding, there was -- did you

 4    have any broken bones?

 5         A.    Well, not to my knowledge because I was

 6    not medically assessed.

 7         Q.    So you don't have any evidence of any

 8    broken bones?

 9         A.    No, sir.

10         Q.    And you weren't bleeding?

11         A.    No, sir.

12         Q.    The second time you said your hands were

13    slammed, what part of your hands were slammed when

14    you were in the food slot?

15         A.    Basically the same, my wrists.

16         Q.    Were you wrists cut when this happened?

17         A.    No, not at this time, no.

18         Q.    And was anything broken in your hands when

19    this happened?

20         A.    Not to my knowledge at this time, no.

21         Q.    Did you complain to anyone that you had a

22    sprained wrists or any bruising on your wrists?

23         A.    Yes, to the medical nurse Hicks at the

24    time of the medical assessment after the incident.

25         Q.    After this incident?
```

David Kates 1/9/2017

1  span was dealing with numerous injuries that

2  occurred.  It dealt with --

3      Q.    Name the injuries.

4      A.    My wrists, my ribs, a possible concussion

5  and contusion, ankle injuries from the restraints

6  and bruises to my neck and back from the actual

7  assault.  All of these medical complaints, sir, are

8  in the record and was stated to medical staff.

9      Q.    So let's back up.  The first time your

10 hand was slammed into the food slot, this startled

11 and injured you, right, the first time?

12     A.    Yes.

13     Q.    So why after your hand was just slammed in

14 the food slot, why would you then put your hands

15 back in that slot again?

16     A.    Because the officer instructed me to, sir.

17     Q.    Well, the officer instructed you to take

18 the cardboard down but you didn't listen to him

19 then.  Why listen to the officer now when you're

20 actually being injured?  I'm confused by that.

21     A.    Let me explain this.  My intentions to

22 block the widow with the paper -- it wasn't

23 cardboard it was paper -- my intention to block the

24 window with paper was to get results.

25     Q.    Why not after your hand was slammed by who

David Kates 1/9/2017

```
 1    that you send that to me pursuant to the Federal

 2    Rules of Civil Procedure.

 3         A.    You would like to have a copy of that,

 4    sir?

 5         Q.    Yes, sir.

 6         A.    I don't think that would be a problem,

 7    sir.

 8         Q.    So let's now go to what happened after

 9    your hand was slammed in the flood slot.  Then the

10    officers then put restraints on your hands?

11         A.    Yes.  After the second attempt, yes.

12         Q.    Then what happened?

13         A.    Then they handcuffed Mr. Collins.

14         Q.    Then what happened?

15         A.    They told me to stay in the back of the

16    cell and they opened the door and pulled out

17    Mr. Collins.

18         Q.    Then what happened?

19         A.    Then they pulled me out second.

20         Q.    Keep going.

21         A.    After they pulled me out, they took me to

22    the middle of the range, which is their protocol,

23    bent me over forward.  One officer holding my head

24    to the front, an officer on the left and an officer

25    on the right.  And they proceeded to back me down
```

David Kates 1/9/2017

```
 1    the range.
 2         Q.    Is this standard protocol for the BOP to
 3    do it this way, the way they escorted you?
 4         A.    At USP Lewisburg it is.  Any other
 5    institution I have never seen this.  Only at USP
 6    Lewisburg.
 7         Q.    And this is the Lewisburg special
 8    management unit, correct?
 9         A.    Yes, sir.
10         Q.    What happened next?
11         A.    I was escorted off the range.
12         Q.    Then what happened?
13         A.    Once I was escorted off the range, you
14    have a spot they call the second floor landing or
15    the first floor landing once you go up under the
16    gate and come out off the range.  Once I got in that
17    area right there, one of the officers tried to trip
18    me and take me to the ground.  Once they seen that
19    wasn't successful, they slammed me to the ground,
20    start punching, kicking and assaulting me and
21    started yelling "stop resisting."
22         Q.    How big of an area is this landing area?
23         A.    I'm not a hundred percent sure, sir.  It
24    is on the video and I have made my own diagram of
25    this area.
```

David Kates 1/9/2017

```
 1    the DHO, Mr. Jordan showed me still photos of Packer
 2    walking on side of me.  The range video footage will
 3    show that Packer was on the range and he never
 4    escorted me.  That's what I told you.
 5         Q.   So the video shows that Packer didn't
 6    escort you; is that what you're saying?  I'm getting
 7    confused.
 8         A.   Yes.  The video will show that CO Robert
 9    Packer who wrote the incident report and said I bit
10    him and assaulted him never controlled my head and
11    never escorted me down the range on May 24, 2012.
12         Q.   So you would agree if he wasn't involved
13    in escorting you down that he couldn't possibly be
14    involved in slamming you in the ground and then
15    fight that took place, the assault that took place?
16    You agree that Packer couldn't have been involved in
17    that, right?
18         A.   No, sir.  I do not agree --
19         Q.   How did Packer --
20         A.   Listen, no, sir, I do not --
21         Q.   So how did Packer get there if he's not
22    escorting you down range?
23         A.   Listen to what I'm saying clearly.  I do
24    not -- I am not stating that Packer or any other
25    officer that I seen them assault me.  I do not know
```

David Kates 1/9/2017

```
 1   who actually assaulted me because my head was down,
 2   I was slammed to the ground, I was being punched and
 3   kicked by numerous officers and I don't know what
 4   officer actually did what.
 5        Q.   Was it possible that officers that were on
 6   the scene didn't punch you and kick you because you
 7   didn't see them?
 8        A.   Yes, that's possible.
 9        Q.   It's possible that only one officer was
10   the one that was kicking and punching you, right?
11        A.   No, it's impossible because there was
12   numerous officers punching me and kicking me in
13   different areas in my body.  So it was more than
14   one.
15        Q.   But you said you didn't see anybody
16   punching and kicking you?
17        A.   No I didn't see them, but I felt them.
18        Q.   So is it possible that somebody punched
19   you and kicked you on multiple portions of your body
20   without it just being one person?  One person can
21   kick and hit at the same time, correct?
22        A.   Correct.  But it was numerous officers
23   around me.  There was numerous officers kicking me
24   and punching me.  I could just not identify which
25   officer did what.
```

David Kates 1/9/2017

```
 1       Q.   And you've got seven officers you listed.
 2   You don't know how many of the seven officers were
 3   the ones punching and kicking you, correct?
 4       A.   I had more than seven officers listed but
 5   I had them down for different things.  Failure to
 6   intervene and protect, the actual assaults, failure
 7   to report the violations to their subordinate.  So I
 8   had --
 9       Q.   So the remaining defendants who allegedly
10   kicked and punched you and according to the report
11   and recommendation are Wise Stroud and Wagner.  But
12   you can't identify whether or not Wise, Stroud or
13   Wagner were the individuals that actually used
14   excessive force on you because you didn't see them,
15   correct?
16       A.   Let's make this clear on the record.  The
17   remaining claims that judge -- the judge allowed me
18   to proceed on was the Eighth Amendment claim for
19   excessive force and the failure to intervene and
20   protect claim, correct?
21       Q.   Yes?
22       A.   So there are seven officers --
23       Q.   So the judge, in his opinion said
24   defendants Wise Stroud and Wagner are the
25   individuals who you allege were the ones that
```

David Kates 1/9/2017

1    committed excessive force by punching and stomping

2    you.  But yet you would agree that you didn't see

3    any of these individuals punch or strike, kick you

4    at any time, right?

5         A.   I didn't actually see who kicked me or who

6    punched me or who did any of the assaulting.

7         Q.   Okay.

8         A.   I'm just going off of the memorandums.

9         Q.   Did you -- do you have any witnesses to

10   this event, the punching and kicking, assaulting

11   you?

12        A.   No.

13        Q.   How about Officer Wise?  What was Officer

14   Wise involvement in this?

15        A.   According to his memorandums and

16   declarations he escorted me and was holding my left

17   arm.

18        Q.   So why is that a constitutional violation?

19        A.   You mean the escort or the assault?

20        Q.   No.  You didn't tell me Wise assaulted

21   you.  You just told me that Wise escorted you.  I'm

22   saying what did Officer Wise do?  You just said he

23   escorted you, that was it.

24        A.   Yes.  According to his memorandums he

25   escorted me down the range and he stated that he

David Kates 1/9/2017

```
 1    took me to the ground.
 2        Q.   He took you to the ground?  And what was
 3    his reasoning?
 4        A.   He stated that I became combative or
 5    disruptive.
 6        Q.   You would agree that you were a little
 7    disruptive that right, weren't you?
 8        A.   No, sir.  I was not disruptive at all.
 9        Q.   So you're saying that he admits to taking
10    you down.  Other than doing that, what else did he
11    do that violates your constitutional rights?
12        A.   He assaulted me.
13        Q.   Where do you say in your complaint that he
14    assaulted you?  Because I'm confused now because
15    again you said you don't know who assaulted you and
16    now you're saying Wise assaulted you.
17        A.   Because Wise stated that he took me to the
18    ground.  Wise was present when -- he said he took me
19    to the ground because I was assaulted.  Wise,
20    Stroud, Wagner, they were present.  They was the
21    officers who took me to the ground according to
22    their documents.  They was the only officers around.
23        Q.   So taking you to the ground is in your
24    definition is an assault?
25        A.   They was the only officers around and I
```

David Kates 1/9/2017

```
 1    was not assaulted by a ghost.

 2         Q.    So Officer Wise took you to the ground.

 3    But did he do anything like kick or punch or hit

 4    you?

 5         A.    It is to my belief based on the

 6    documentation that all the officers who escorted me

 7    and had me and took me to the ground assaulted me.

 8    Yes.

 9         Q.    But you didn't see Officer Wise in

10    particular assault you, did you?

11         A.    I couldn't actually see anyone actually

12    assault me.

13         Q.    What did Officer Wise look like?

14         A.    About 6'4" white male, bald head, goatee

15    about 225-30 pounds.

16         Q.    Any other description you can give of him?

17         A.    That's about it.  I've seen him several

18    times when was in the SMU and I particularly seen

19    his face on the video.

20         Q.    How about Officer Stroud, what did he do?

21         A.    According to the documentation he was the

22    one who was controlling my head and he was the one

23    who was squeezing my neck.  And we stopped in the

24    middle of the range and I told him I couldn't

25    breathe.  But he's the officer who escorted me all
```

David Kates 1/9/2017

1      A.    According to his documents he sprayed the
2  gas in the cell.  So he was on the scene.
3      Q.    Then what happened -- what did he fail to
4  prevent?  What did he fail to intervene in?
5      A.    He was a supervising lieutenant on the
6  scene.  He failed to intervene to stop the assault.
7      Q.    Which assault?
8      A.    The 5/24/12 assault that occurred on the
9  second floor landing outside of the range video
10  footage.
11      Q.    Did you see him at the scene when this
12  assault took place?
13      A.    No, I did not see him personally, but the
14  documentation verifies he was present.
15      Q.    Did the documentation verify that he was
16  on the scene of the landing?
17      A.    Yes, sir, the DHO report.
18      Q.    And how long was this assault?  How long
19  did it take place?
20      A.    The actual assault of the beating and the
21  kicking, I'll say between 35 to 45 seconds.  But you
22  must remember, once I was taken from the floor and
23  escorted into the shower area, I was around the same
24  officers for approximately 30 to 40 minutes before I
25  was decontaminated.  And extra torture and assaults

David Kates 1/9/2017

1   was on the range.

2       Q.   What does he look like?

3       A.   Lieutenant Booth, white male about 6"4",

4   no facial hair, like a dark brown hair.  Like I

5   said, 6'4" about 200-pounds, 220-pounds.

6       Q.   How about Officer Brent, what did he do?

7       A.   Again, he was one of the lieutenants on

8   the scene.  He sprayed the gas and he was present

9   when they was walking me down the range.

10      Q.   I'm sorry, I duplicated him.  I meant

11  Officer Eroh.  Is it Lieutenant Eroh or officer?

12      A.   It's just CO Eroh.  He was just on the

13  range present when it happened.

14      Q.   Was he on the second floor landing?

15      A.   I'm not a hundred percent sure.

16      Q.   What percentage are you sure that he was

17  there?

18      A.   I'm not a hundred percent sure.  He was on

19  the range, I don't know -- I don't know if he was on

20  the second floor landing.

21      Q.   What did Eroh look like?

22      A.   Eroh he's fairly thin guy, about 5'10"

23  160-pounds, no facial hair, short dark brown hair.

24  Maybe early 30s, mid 30s.

25      Q.   Okay.  Tell me all the -- so you were



GOVERNMENT EXHIBIT
6

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DAVID E. KATES,                          )
                                         )
          Plaintiff                      )        CIVIL ACTION NO. 3:13-CV-1525
                                         )
     vs.                                 )
                                         )
C.O. ROBERT PACKER, et al.               )
                                         )
          Defendants                     )

### DECLARATION OF C. BRANDT

1.     I am currently employed by the Federal Bureau of Prisons (hereafter "BOP") as a lieutenant, and am assigned to the United States Penitentiary, Lewisburg, PA (hereafter "USP Lewisburg"). As a part of my duties and responsibilities, I have access to inmates' records. I certify that the Attachments referenced herein are true and accurate to the best of my knowledge and are maintained in the ordinary course of business.

2.     On May 24, 2012, there was an assistance call from staff assigned to G Block, where inmate Kates was assigned. I was the Lieutenant who arrived on the scene after assistance was requested. The Plaintiff and his cell mate were unresponsive and still had their window covered. I attempted to get the inmates to respond by verbally addressing them and by knocking on the door. Due to their unresponsiveness and what I determined to be a situation where they could not be approached safely it was determined an immediate use of force was required. The food slot was opened and a broom handle was used to remove the mattress from obstructing the cell. Chemical agents were administered into the cell. The broom handle broke off in the cell while trying to clear the obstruction but it was surrendered by the inmates after several bursts of chemical agents were administered into the cell. The inmates then submitted to hand restraints

1

and were removed from the cell. Kates bit an officer while being escorted for decontamination.
The inmate and staff were medically assessed. The acting warden authorized Kates to be placed
into ambulatory restraints.

**See Brandt Memo dated May 24, 2012; Form 583 Report of Incident**

3.       Kates was placed in ambulatory restraints following the incident. Regular 15
minute restraint checks were made by staff. Two hour checks were made by a lieutenant. Health
services checks were made twice per shift. Plaintiff was in restraints from 10:30pm on May 24,
2012 through noon on May 25, 2012 (a little more than 12 hours). An after action review was
conducted by staff who are not defendants in this case. It was concluded that the actions taken
with respect to the use of force and/or restraints were reasonable and appropriate. **See 15 minute
check forms; Lieutenant checks forms; Health services checks forms; Form 586 After
Action Review**

The documents attached to this declaration:

a. are true and correct copies of records maintained by the Bureau of Prisons; b. were
created at or near the time of the occurrence of the matters reflected therein by someone
with knowledge; or c. were made by the Bureau of Prisons as a regular practice.
I am either custodian of the documents or am otherwise qualified to execute this
certification, pursuant to Fed. R. Evid. 803(6) and 902(11).

2

I declare under penalty of perjury pursuant to 28, United States Code, Section 1746, that

the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 3ʳᵈ day of October, 2014

C. Brandt
Lieutenant
USP Lewisburg

3

Brandt Memo dated May 24, 2012



U. S. Department of
Justice

Federal Bureau of Prisons
United States Penitentiary Lewisburg

Lewisburg, PA 17837

May 24, 2012

MEMORANDUM FOR FILE

FROM:        C. Brandt, West Lieutenant
             USP Lewisburg

SUBJECT:     Immediate use of Force Inmates –
             Kates, David, #30428-077 and Collins, Bobby,
             #27382-077

On May 24, 2012, approximately 10:05 p.m., while G-Block staffs were
conducting their count of G-Block they observed the inmates in cell
215 had their cell door window covered and were unresponsive to their
orders.  At this time G-Block staff requested a Lieutenant to come
to cell 215 in G-Block. Inmates Kates, David, #30428-077 and Collins,
Bobby, #27382-077 are assigned to cell 215 in G-Block. When I arrived
Kates and Collins still had their window covered and continued to
be unresponsive. I attempted verbally and by knocking on the cell
door to get Kates and Collins to respond. At approximately 10:08
pm I had the G-Block 3rd floor officer call for assistance by
activating his body alarm. Due to the fact the inmates were
unresponsive and could not be approached safely immediate use of
force was used.  The food slot was opened in order to administer
chemical agents.  The inmates had the food slot covered with sheets
and a mattress.  A broom handle was utilized in order to clear the
items blocking the food slot.  At this time I administered two, two
second, bursts of chemical agents from my MK-9.  While the broom
was being utilized to remove the mattress from the food slot it was
broke off inside the cell.  The inmates immediately pushed the broom
handle back out of their cell and submitted to hand restraints. Both
inmates were removed from the cell.  Lieutenant J. Foura directed
staff to escort inmate Collins off the range to be decontaminated.
Collins became combative and staff placed Collins on the floor with
the least amount of force necessary to gain control of him.  Inmate
Collins refused to walk.  Lieutenant J. Foura instructed staff to
carry Collins to the first floor shower, for decontamination, and
to not carry him by his restraints.  While inmate Kates was being
escorted to the second floor shower he became combative and assaulted
staff by bitting Officer R. Packer on the right pinky finger.

CONFIDENTIAL

Inmate Kates was placed on the floor with the least amount of force necessary to gain control. The Acting Warden was contacted and granted authorization to place inmate Kates into immediate ambulatory restraints due to his assaultive behavior.  Inmate Kates was decontaminated, visually searched, metal detected, placed into new clothing and placed him into ambulatory restraints at 10:30 pm. Inmate Kates was then medically assessed and photographed. Medical staff reported Kates had a cut on his right wrist area which needed to be treated in Health Services.  Kates was escorted to the urgent care room in Health Services where he was treated.  Kates was then escorted back to and secured in cell 103 in G-Block without further incident.  A video debrief was conducted with responding staff. Medical staff reported inmate Collins had a laceration on the right side of his scalp and a contusion on the left forehead area. Medical staff also reported Kates had a laceration on his right wrist. Officer R. Packer was medically assessed and sustained contusion to his right pinky finger due to inmate Kates biting him.

GOVERNMENT
EXHIBIT
C

CARDELS 000-783-0399

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DAVID E. KATES,                    )
                                   )
            Plaintiff              )      **CIVIL ACTION NO. 3:13-CV-1525**
                                   )
    vs.                            )
                                   )
C.O. ROBERT PACKER, et al.         )
                                   )
            Defendants             )

## DECLARATION OF G. WISE

1.      I am currently employed by the Federal Bureau of Prisons (hereafter "BOP") as a
Correctional Officer, and am assigned to the United States Penitentiary, Lewisburg, PA
(hereafter "USP Lewisburg"). As a part of my duties and responsibilities, I have access to
inmates' records. I certify that the Attachments referenced herein are true and accurate to the
best of my knowledge and are maintained in the ordinary course of business.

2.      On May 24, 2012, there was an assistance call from staff assigned to G Block,
where inmate Kates was assigned. I responded to the assistance call on May 24, 2012. Upon
entering the shower area on the second floor of G Block Kates became combative and I assisted
with regaining control of him. I also assisted in carrying him to the urgent care room for medical
treatment. **SeeWise Memo dated May 24, 2012**

1

I declare under penalty of perjury pursuant to 28, United States Code, Section 1746, that
the foregoing is true and correct to the best of my knowledge, information, and belief.

The documents attached to this declaration:

a. are true and correct copies of records maintained by the Bureau of Prisons; b. were
created at or near the time of the occurrence of the matters reflected therein by someone
with knowledge; or c. were made by the Bureau of Prisons as a regular practice.
I am either custodian of the documents or am otherwise qualified to execute this
certification, pursuant to Fed. R. Evid. 803(6) and 902(11).

Executed this _____/_____ day of October, 2014

G. Wise
Correctional Officer
USP Lewisburg

**Wise Memo dated May 24, 2012**



**U.S. GOVERNMENT**

## MEMORANDUM

**FEDERAL BUREAU OF PRISONS**
**UNITED STATES PENITENTIARY**
**LEWISBURG, PA.**


DATE:    5-24-2012

FROM:   G. Wise /S.O.S

SUBJECT:  Assistance G-block

TO:   File


On the above date at approximately 10:08 pm, this Officer responded to and assistance call on G-Block 2nd Floor, cell # 215.   This Officer assisted in escorting Inmate Kates to the second floor shower of G-block.   Upon entering the second floor shower, Kates became combative and was placed on the floor to regain control.   Once Kates was under control, this Officer maintained control of his upper right appendage and assisted in placing Kates in ambulatory restraints.   At this time, Kates was medically assessed, placed in the Reeves sleeve, and taken to the urgent care room for further medical treatment.   This Officer assisted in carrying Kates to the urgent care room and maintained control of his upper left appendage while he was being treated.   This Officer has no know injuries to report at this time.



GOVERNMENT EXHIBIT

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DAVID E. KATES,                    )
                                   )
        Plaintiff                  )        CIVIL ACTION NO. 3:13-CV-1525
                                   )
    vs.                            )
                                   )
C.O. ROBERT PACKER, et al.         )
                                   )
        Defendants                 )

## DECLARATION OF J WAGNER

1.      I am currently employed by the Federal Bureau of Prisons (hereafter "BOP") as a correctional officer, and am assigned to the United States Penitentiary, Lewisburg, PA (hereafter "USP Lewisburg"). As a part of my duties and responsibilities, I have access to inmates' records. I certify that the Attachments referenced herein are true and accurate to the best of my knowledge and are maintained in the ordinary course of business.

2.      On May 24, 2012, there was an assistance call from staff assigned to G Block, where inmate Kates was assigned. I responded to the assistance call on May 24, 2012. I acquired a broom on my way to the cell (someone yelled to bring one). When I arrived at the cell the inmates had a mattress barricading the wicket (slot in the door where food trays are exchanged with the inmates, hand restraints are applied, etc.) to the cell. I used the broom to push the mattress to the side so the lieutenant could administer gas into the cell. After the gas was administered the inmates submitted to hand restraints. I then assisted in escorting Kates to the shower area. Kates bit another officer during the escort and he was placed on the ground in order to regain control of him. I assisted in decontaminating Kates and escorting to the hospital for medical care. **See Wagner memo dated May 24, 2012**

1

I declare under penalty of perjury pursuant to 28, United States Code, Section 1746, that the foregoing is true and correct to the best of my knowledge, information, and belief.

The documents attached to this declaration:

a. are true and correct copies of records maintained by the Bureau of Prisons; b. were created at or near the time of the occurrence of the matters reflected therein by someone with knowledge; or c. were made by the Bureau of Prisons as a regular practice. I am either custodian of the documents or am otherwise qualified to execute this certification, pursuant to Fed. R. Evid. 803(6) and 902(11).

Executed this ___6ᵗʰ___ day of October, 2014

J. Wagner
Correctional Officer
USP Lewisburg

2

Wagner Memo dated May 24, 2012



U.S. GOVERNMENT

MEMORANDUM

FEDERAL BUREAU OF PRISONS
UNITED STATES PENITENTIARY
LEWISBURG, PA.

DATE :   5/24/12

FROM:   J. Wagner, S.O.S.

SUBJECT:   Assistance call in G-Block

TO:   File

On 5/24/12 at approximately 10:08 PM , I responded to the 2ndt Floor G-Block cell 215 to an assistance call. While responding I heard staff yell to bring a broom to the cell. I went to the closet and got the broom and took it with me to the cell. I pushed the handle into the cell pushing the mattress to the side so the Lt could administer gas into the cell. While I pushed the mattress the broom handle broke in the cell. The inmates then pushed the broken part under the door back to us. The inmates then complied with staff orders to submit to hand restraints. I then assisted responding staff in escorting inmate Kates #30428-077 to the shower. While escorting inmate Kates to the shower he bite officer Packer in the hand. He was taken to the ground to regain control. After regaining control he was escorted to the shower to applying ambulatory restraints. After applying restraints we escorted him to the hospital for medical care the back to G-Block cell 103 without further incident.

GOVERNMENT
EXHIBIT

E

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DAVID E. KATES,                    )
                                   )
        Plaintiff                  )        CIVIL ACTION NO. 3:13-CV-1525
                                   )
vs.                                )
                                   )
C.O. ROBERT PACKER, et al.         )
                                   )
        Defendants                 )

### DECLARATION OF D. EROH, JR

    1.    I am currently employed by the Federal Bureau of Prisons (hereafter "BOP") as a Correctional Officer, and am assigned to the United States Penitentiary, Lewisburg, PA (hereafter "USP Lewisburg"). As a part of my duties and responsibilities, I have access to inmates' records. I certify that the Attachments referenced herein are true and accurate to the best of my knowledge and are maintained in the ordinary course of business.

    2.    On May 24, 2012, I was working G Block (Plaintiff's unit) assigned to the 4pm to 12am shift. Kates and his cell mate covered the window to the cell several times throughout the course of the evening shift. The inmates refused to respond as well. Inmates can-not have their windows covered for security reasons. Staff must be able to tell that the inmates are present and that they are in good health. The lieutenant had to be notified each time the window was covered. One of these occasions was at approximately 7:00pm. I was conducting a range tour and discovered Plaintiff's cell window was covered, again, preventing me from seeing into the cell. The inmates in the cell refused my orders to remove the cover from the cell window. The shift lieutenant was notified and the cell window was uncovered without further incident. I wrote an incident report but it was not processed. **See Eroh Declaration, Incident Report**

1

3.      On May 24, 2012, I was one of the officer's conducting the 10pm count of the range where the Plaintiff was assigned. At approximately 10:08pm I observed the window of the Plaintiff's cell was covered. The inmates were ordered to remove the covering from the window but did not obey. Further, the inmates did not verbally respond. A request for assistance was made by another officer. Staff responded to the assistance call. I had no further involvement with the incident involving Kates that night.

I declare under penalty of perjury pursuant to 28, United States Code, Section 1746, that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this ___25th___ day of September, 2013.


_____
D. Eroh, Jr.
Correctional Officer
USP Lewisburg

2

# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DAVID E. KATES,** | : | **NO. 3:CV-13-1525** |
| Plaintiff | : | |
| | : | **(Caputo, J.)** |
| v. | : | **(Saporito, M.J.)** |
| | : | |
| **ROBERT PACKER, ET AL.,** | : | |
| Defendants | : | **Filed Electronically** |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he is an employee in the Office of the United States Attorney for the Middle District of Pennsylvania and is a person of such age and discretion to be competent to serve papers.

That on March 1, 2017, he served a copy of the attached

## DEFENDANTS' EXHIBITS IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

by placing said copy in a postpaid envelope addressed to the person hereinafter named, at the place and address stated below, which is the last known address, and by depositing said envelope and contents in the United States Mail at Williamsport, Pennsylvania.

David E. Kates
Reg. No. 30428-077
FTC Oklahoma City
P.O. Box 898801
Oklahoma City, OK  73189


s/Michele E. Lincalis
Michele E. Lincalis
Supv. Paralegal Specialist